UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN LEWIS,<br><br>Plaintiff,<br><br>v.<br><br>REGIONS BANK a/k/a ENERBANK USA,<br><br>Defendant. | No. 1:24-cv-00816-KES-EPG<br><br>ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION<br><br>Doc. 15 |

Plaintiff John Lewis sued Regions Bank, a/k/a EnerBank USA ("EnerBank") for fraudulent conduct relating to a 25-year, $45,000 loan agreement ("EnerBank contract") on which Lewis alleges his electronic signature was forged. *See* Doc. 1. EnerBank moved to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, on the grounds that Lewis willingly executed the EnerBank contract, which requires binding arbitration of Lewis's disputes with EnerBank. Doc. 15 at 1. The Court has considered the parties' briefing and, for the reasons explained below, denies EnerBank's motion to compel arbitration.

I.   BACKGROUND

Plaintiff John Lewis is a 77-year-old retiree who lives in Bakersfield, California. Doc. 21-3 at 2. Lewis's only source of income is approximately $2,500 per month in social security

1

benefits. *Id.* EnerBank is a financial institution that offers financing for residential solar energy products. *See* Doc. 15-2 at 2. Los Angeles Solar Pros ("Solar Pros") is a residential and commercial solar panel installer. Doc. 23-1 at 10. Solar Pros partners with EnerBank to provide financing to consumers seeking installation of solar panels. *Id.* During the relevant time period, EnerBank offered financing options through its Concert Finance program. Doc. 15-2 at 2.

Around September 2022, salespeople spoke with Lewis at his house regarding the potential installation of a home solar energy system. Doc. 21-3 at 2; Doc. 23-1 at 5. EnerBank asserts that Lewis thereafter executed a home improvement contract for the installation of a home solar energy system with Solar Pros ("Solar Pros contract"), along with the EnerBank contract to finance the installation. Both contracts contain arbitration clauses, and they both bear what EnerBank purports to be Lewis's electronic signature. Doc. 21-1 at 18, 20; Doc. 15-2 at 16, 19. The EnerBank contract does not contain a provision or attachment with notification of any right to cancel the contract. The parties dispute the facts that led to the creation of these two electronically-signed contracts.

### A.    Lewis's Version of Events

According to Lewis's declaration, salespeople from a company called American Solar, or something similar, came to his house once around September 2022. Doc. 21-3 at 2. The salespeople never told Lewis that they were from Solar Pros. *Id.* At that time, Lewis already had solar panels installed on his house that were financed by a loan from another lender, GoodLeap, LLC (the "GoodLeap panels"), but due to the GoodLeap panels' low energy production, Lewis could not afford to pay his loan payment or his utility bills. *Id.* The salespeople offered to install new solar panels on Lewis's house and to pay off his remaining loan balance with GoodLeap. *Id.* The salespeople told Lewis that they could not provide him with an exact price that day because they first needed to check his credit score to determine if he would qualify for the offer. *Id.* The salespeople informed Lewis that his exact payment amount would not be determined until after the solar panels were installed and operational, but that a new monthly payment would be lower than his current monthly payment with GoodLeap. *Id.* at 2–3. They instructed Lewis to tap their iPad to run a credit check and told him that they would get back to him. *Id.* Lewis did not

2

discuss any other details with the salespeople about financing the new solar panels. *Id.* The salespeople did not ask for Lewis's email address. *Id.* at 3. They specifically told him that he would not have to sign any contract until the solar panels were installed and operational. *Id.*

Around January 2023, Lewis allowed workers to remove the GoodLeap panels from his roof and install new solar panels. *Id.* The new solar panels have never been operational since they were installed. Doc. 21 at 7. The workers told Lewis to stop making payments to GoodLeap. Doc. 21-3 at 3. They said they would return to his house for him to sign a contract for the new solar panels, but they never returned. Doc. 21-3 at 3.

Relying on the salespeople's statements that his loan to GoodLeap would be paid off, Lewis stopped making payments to GoodLeap once the workers removed the GoodLeap panels. *Id.* When Lewis continued to receive bills from GoodLeap, he repeatedly called the phone number provided by the salespeople. *Id.* The person who answered the phone did not provide Lewis with any information, and after several calls from Lewis, the person stopped answering Lewis's calls. *Id.*

Around September 2023, Lewis received a call from EnerBank. *Id.* Lewis told the EnerBank representative that he had never heard of EnerBank, that he had not signed any contract relating to the new panels, and that the panels were not even hooked up. Doc. 21-2 at 15. When the representative informed Lewis that Solar Pros had installed the new panels, Lewis told him that he had never heard of Solar Pros. *Id.*

In October 2023, with the assistance of Housing and Economic Advocates, Lewis saw for the first time the Solar Pros and EnerBank contracts. Doc. 21 at 8; Doc. 21-3 at 3. Having neither seen nor given permission to another person to sign on his behalf, Lewis believes his purported electronic signature on each of these documents was forged. Doc. 21 at 8; Doc 21-3 at 4.

The Solar Pros and EnerBank contracts were allegedly electronically executed using DocuSign. *Id.* at 3. Both the Solar Pros contract and the corresponding DocuSign certificate of completion ("DocuSign certificate") incorrectly list Lewis's email as johnnylew3109@gmail.com. Doc. 21-1 at 16, 29. Lewis has never created, used, or had access

3

to that email address, and he does not know how to use DocuSign. Doc. 21-3 at 4. Lewis uses a different email address, jacklewisxxxx@gmail.com.[1] *Id.* at 2. Similarly, the DocuSign certificate associated with the EnerBank contract lists the "in person signing host" as Bajro Ponjevic. Doc. 21-1 at 50. Lewis indicates that he does not know Ponjevic and has never heard this name before. Doc. 21-3 at 4. The EnerBank contract DocuSign certificate also lists the signer's email address as HomeOwnerPrimarySigner_johnnylew3109@gmail.com. Doc. 21-1 at 50. This is not Lewis's email address and he does not have access to it. Doc. 21-3 at 4.

Google's records indicate that the account johnnylew3109@gmail.com was created on September 30, 2022, the same date the Solar Pros contract was allegedly executed.[2] Doc. 21-2 at 33. The only emails in the account's inbox were from EnerBank, Solar Pros, and Concert Finance. *Id.* at 36–37. Additionally, Google's subscriber information lists the birthdate of the creator of the johnnylew3109@gmail.com account as May 25, 1965. *Id.* at 33. That is not Lewis's correct birthday; Lewis was born in 1948. Doc. 21-3 at 2.

On March 25, 2024, Lewis sent EnerBank a letter in which he exercised his right to cancel the EnerBank contract pursuant to California's Home Solicitation Sales Act ("HSSA"), Civ. Code § 1689.7. Doc. 21-1 at 4–14. Shortly thereafter, EnerBank confirmed receipt of Lewis's cancellation letter. *Id.* at 2.

**B.       EnerBank's Version of Events**

On September 30, 2022, Solar Pros employee Bajro Ponjevic visited Lewis's house to sell him new solar panels. Doc. 23-1 at 5. The two had previously met on another sales visit and they scheduled Ponjevic to return to Lewis's house for the further sales visit on September 30, 2022. *Id.* During the September 30 visit, Lewis told Ponjevic that he was dissatisfied with his existing solar panels because his payments and electrical bill were too expensive. *Id.* Ponjevic offered to

---

[1] Lewis has partially redacted this email address, as noted by the "xxxx."

[2] The prefix "HomeOwnerPrimarySigner__" appears to have been added as part of the DocuSign signature process and appears to be separate from the email address. Google confirmed in response to Lewis's subpoena that there is no email address entitled "HomeOwnerPrimarySigner_johnnylew3109@gmail.com." Doc. 21-2 at 3.

4

sell Lewis a new solar panel system, but he informed Lewis that he would still have to pay off his existing loan to GoodLeap. *Id.* Ponjevic asserts that neither he, nor anyone on his sales team, represented to Lewis that Solar Pros would pay the remaining balance on Lewis's GoodLeap loan. *Id.* During this visit, Lewis said he wanted Ponjevic to install a new solar system and mentioned that he would be entitled to a government rebate. *Id.* at 5–6. Ponjevic asserts that neither he nor anyone with him carried an iPad during the visit to Lewis's house. *Id.* at 6. Solar Pros' CEO, Steve Magdesyan, asserts that it is not customary for a Solar Pros sales representative to carry iPads with them for purposes of selling solar installation projects, but he acknowledges that the sales representatives typically use their personal devices to run credit checks and loan applications. *Id.* at 11.

During the September 30, 2022 visit, Ponjevic used his phone to check Lewis's credit by visiting the Concert Finance website and inputting his own credentials and email address. *Id.* at 6. Ponjevic asserts he then sent the Solar Pros contract to Lewis's phone via DocuSign and that Lewis answered the DocuSign security questions and executed the contract in his presence. *Id.* The DocuSign certificate for the Solar Pros contract does not reflect that the signer answered any security questions; in contrast, the DocuSign certificate for the EnerBank contract notes that the signer passed five out of six security questions. *Compare* Doc. 15-2 at 38 *with* Doc. 21-1 at 29. The DocuSign certificate indicates that the Solar Pros contract was signed 19 seconds after it was first viewed on September 30, 2022. Doc. 21-1 at 29.

While EnerBank claims that Lewis was provided the EnerBank contract on September 30, 2022, Doc. 15 at 8, Ponjevic does not assert that he provided a copy of the EnerBank contract or otherwise discussed any financing terms, including an arbitration clause, with Lewis during the September 30 visit. The EnerBank DocuSign certificate indicates that the EnerBank contract was first viewed by someone on September 30, 2022, and was signed October 4, 2022. Doc. 15-2 at 38.

On October 4, 2022, Ponjevic returned to Lewis's house to ensure that Lewis wished to move forward with the transaction and to have him sign the EnerBank contract. Doc 23-1 at 6. Ponjevic represents that he discussed the terms of the EnerBank contract with Lewis and that

5

Lewis executed the EnerBank contract via DocuSign on his phone. *Id.* Lewis passed the DocuSign ID check by answering five out of the six security questions correctly. Doc. 15 at 9. There is no indication that Ponjevic or anyone with him told Lewis about his right to cancel the EnerBank contract. Ponjevic represents that he wore a visible ID badge that stated his name, phone number, address, and associated company during his interactions with Lewis. Doc. 23-1 at 7.

EnerBank asserts that they subsequently sent Lewis text messages to approve disbursement of the loan funds to Solar Pros. Doc. 15-2 at 43–46. Each text message allowed Lewis to deny the corresponding funding by responding "NO" within 24 hours; the funds were to be disbursed if Lewis responded "YES" or if he did not respond to the text message. *Id.* On October 5, 2022, EnerBank sent Lewis the first text message request to authorize Concert Finance to disburse $27,000 to Solar Pros. *Id.* at 43. Lewis did not respond to this message, and the funds were disbursed 24 hours later. *Id.* From November 1, 2022 through November 9, 2022, EnerBank sent Lewis multiple text messages asking him to approve the second disbursement, for the remaining $18,000 of the loan proceeds. *Id.* at 44–46. EnerBank asserts that, after not responding to the first 14 text messages, Lewis replied "YES" to the 15th text message. *Id.* at 46. Lewis does not recall receiving any text messages from Concert Finance or authorizing any distribution of funds. Doc. 21-3 at 4–5. Lewis represents that he was unable to locate any of the alleged text exchanges on his phone despite a thorough search. *Id.*

## II.      LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs arbitration agreements. 9 U.S.C. § 2. "Section 2 of the statute makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 649–50 (2022) (quoting 9 U.S.C. § 2). "As [the Supreme Court has] interpreted it, this provision contains two clauses: [a]n enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law, and a saving clause, which permits invalidation of arbitration clauses on grounds applicable to 'any contract.'" *Id.* at 650 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339–40 (2011)).

An aggrieved party seeking to enforce a written arbitration agreement may petition the court for "an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. In ruling on a motion to compel arbitration, a court's role is "limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) *see also* Code Civ. P. § 1281.2 (a court may order arbitration only after "it determines that an agreement to arbitrate the controversy exists . . . .")

While "[p]ublic policy favors contractual arbitration as a means of resolving disputes . . . that policy does not extend to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration." *Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1057 (2016) (internal quotation marks and citations omitted). "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did not enter into such an agreement." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (quoting *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3rd Cir. 1980). A court may also deny a motion to compel arbitration if "[g]rounds exist for recission of the agreement." Code Civ. P. § 1281.2(b).

In deciding on a motion to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declaration, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." *Engella v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855.

### III.    ANALYSIS

"Although challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general, properly directed to the court." *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) (internal citations omitted).

Lewis provides three bases to challenge the existence of an arbitration agreement between him and EnerBank.  First, the EnerBank contract is void for failing to notify Lewis of his right to cancel the contract under the HSSA.  Second, even if the EnerBank contract is not void, Lewis lawfully cancelled it.  Third, EnerBank fails to show that Lewis entered into the EnerBank contract and agreed to arbitration.

**A.    EnerBank's Failure to Notify Lewis of His Right to Cancel Makes the EnerBank Contract Voidable**

The California Legislature enacted the HSSA "to protect consumers against the types of pressures that typically can arise when a salesman appears at a buyer's home." *Weatherall Aluminum Prod. Co. v. Scott*, 71 Cal. App. 3d 245, 248 (1977).  The HSSA broadly applies to "any contract . . . for the sale, lease, or rental of goods or services or both, made at other than appropriate trade premises" for $25 or more.  Civ. Code § 1689.5(a).  The HSSA excludes financial services, but only those "that are not connected with the sale of goods or services as defined herein . . . ." Civ. Code § 1689.5(d).  The HSSA also requires home solicitation contracts to contain a right to cancel provision that notifies the buyer of their right to cancel the transaction within three business days, or five business days when the buyer is a senior citizen.  Civ. Code § 1689.7(a).  Further, the seller must "provide the buyer with a copy of the contract . . . and the attached notice of cancellation, and shall inform the buyer orally of the buyer's right to cancel and the requirement that cancellation be in writing, at the time the home solicitation contract or offer is executed." Civ. Code § 1689.7(f).

As the EnerBank contract was to finance the Solar Pros contract, and EnerBank asserts that both contracts were entered into at Lewis's residence, the EnerBank contract is a home solicitation contract as defined under the HSSA.  Accordingly, the EnerBank contract was required to include a right to cancel provision and an accompanying notice of cancellation.  It fails to meet both requirements.

Lewis asserts that EnerBank's failure to include a right to cancel provision and notice of cancellation makes the EnerBank contract void.  Lewis compares the cancellation notice requirements in the HSSA to similarly worded requirements in California's Credit Services Act,

8

Civ. Code § 1789.16, under which courts have held that the failure to comply with such requirements prevents a contract from being formed and thereby renders any arbitration provision in it unenforceable. *See e.g.*, *Ferguson v. GreenSky, Inc.*, 2023 WL 4462126, at *2 (9th Cir. July 11, 2023) ("Because the parties did not form an agreement under the applicable statutory requirements, 'there is no basis upon which to compel arbitration.'") (quoting *Ahlstrom*, 21 F.4th at 635).

But unlike the Credit Services Act, the HSSA provides the buyer with a right to cancel the contract, rather than invalidating the contract as a matter of law. The HSSA provides that, "[u]ntil the seller has complied with [the notice of cancellation requirement], the buyer may cancel the home solicitation contract or offer." Civ. Code § 1689.7(g). The California Court of Appeals has found that when a "[home solicitation] contract did not contain the required notice giving the Buyer a right to cancel within three days, the statute technically extended indefinitely (until the Seller complied with the notice requirement) the Buyer's right to cancel." *Beley v. Mun. Ct.*, 100 Cal. App. 3d 5, 8 (1979) (internal citation omitted). Accordingly, while the EnerBank contract was not voided as a matter of law by the contract's failure to notify Lewis of his right to cancel, that failure to notify extended Lewis's deadline to cancel the contract until EnerBank corrected its deficiency, which EnerBank failed to do.

**B.    Lewis Lawfully Canceled the EnerBank Contract**

EnerBank argues that contract recission is not an issue of contract formation and thus must be decided in arbitration.[3] Doc. 23 at 8. But whether Lewis timely canceled the EnerBank contract goes to whether there was even a contract in effect, and therefore whether there was an arbitration agreement. *See* Code Civ. P. § 1281.2 (a court may order arbitration only after "it determines that an agreement to arbitrate the controversy exists . . . .")

As the EnerBank contract failed to provide Lewis with notice of his right to cancel, Lewis's right to cancel was extended indefinitely, unless and until EnerBank corrected its failure. But EnerBank never provided Lewis with notice of his cancellation rights. Lewis therefore

---

[3] Under California law, a court may deny a motion to compel arbitration "if grounds exist for rescission of the arbitration agreement." Code Civ. P. § 1281.2(b).

9

timely exercised his right to cancel the EnerBank contract when he sent EnerBank a cancellation letter on March 25, 2024. *See* Doc. 21-1 at 4–14.

EnerBank nonetheless claims that Lewis waived his right to cancel the EnerBank contract by replying "YES" to Concert Finance's text request to disburse loan funds to Solar Pros on November 9, 2022. Doc. 23 at 8. EnerBank argues that Lewis was estopped from cancelling the contract because he purportedly had "full knowledge of the facts that would warrant recission" when he affirmatively funded the loan and the solar panels were installed on his roof. *Id.* EnerBank's argument is unpersuasive.

First, EnerBank fails to establish that Lewis had full knowledge of the relevant facts, as it fails to establish Lewis's knowledge of the EnerBank contract. The DocuSign certificate associated with the EnerBank contract lists the "in person signing host" as Bajro Ponjevic. Doc. 21-1 at 50. It also lists the signer's email address as "HomeOwnerPrimarySigner_johnnylew3109@gmail.com," Doc. 21-1 at 50, which is not Lewis's email address. Google confirmed that the "johnnylew3109@gmail.com" email address was created on September 30, 2022, the same date the Solar Pros contract was purportedly executed. Doc. 21-2 at 33. And the only emails in the account's inbox were from EnerBank, Solar Pros, and Concert Finance. *Id.* at 36–37. Lewis did not have access to this email address, *see* Doc. 21-3 at 4, and the creator of the account used a false birthday for Lewis. Doc. 21-2 at 33; Doc. 21-3 at 2. Nor does EnerBank establish that it provided the contract to Lewis by other means. Given this record, EnerBank fails to show that in November 2022 Lewis had knowledge of the facts that would warrant recission.

Second, the California Court of Appeals has held that affirmatively funding and receiving the benefits of a home solicitation contract does not bar a buyer from canceling a contract when the seller fails to include a right to cancel provision and notice of the right to cancellation. *Weatherall*, 71 Cal. App. 3d at 247–249. In *Weatherall*, the court ruled that even though the buyer had already paid the seller a $100 deposit and received the contracted insulated wall system, the buyer could still lawfully cancel the contract. *Id.* The court ruled the buyer's right to cancel extended even after the seller sued the buyer for contract infringement because the contract

did not contain a notice of the buyer's right to cancel as required by the HSSA. *Id.*; *see also Nordeman v. Dish Network LLC*, 525 F. Supp. 3d 1080, 1087 (N.D. Cal. 2021) (applying *Weatherall* to deny a motion to compel arbitration).

Contrary to EnerBank's argument, the court in *Beley* did not limit the buyer's ability to cancel the contract; rather, *Beley* noted that the seller may have an equitable claim against the buyer if the seller's performance conferred a substantial benefit on the buyer. *See* 100 Cal. App. 3d at 8. But on the present motion, the issue is not whether EnerBank might have an equitable claim against Lewis based on its alleged substantial performance, but whether it has a valid contract and therefore whether a valid arbitration agreement exists.[4] EnerBank does not have a valid contract with Lewis, as Lewis timely cancelled it. As Lewis lawfully cancelled the EnerBank contract, there is no valid arbitration agreement.

**IV.    CONCLUSION**

For the reasons addressed above, defendant's motion to compel arbitration and stay the case, Doc. 15, is denied.

IT IS SO ORDERED.

Dated:    May 4, 2026

_____
UNITED STATES DISTRICT JUDGE

---

[4] Moreover, EnerBank has not asserted any counterclaim against Lewis seeking equitable relief for funds it disbursed to Solar Pros.

11